IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
GREENVILLE DIVISION

KELVIN FRANKLIN                                                                    PLAINTIFF

v.                                                        CIVIL ACTION NO. 4:23-CV-165-SA-JMV

CITY OF INDIANOLA, MISSISSIPPI;
CHIEF RONALD SAMPSON, in his individual and
official capacity; OFFICER GREG CAPERS, in his
individual and official capacity; JOHN DOES 1-5 in
their individual and official capacities                                        DEFENDANTS

ORDER AND MEMORANDUM OPINION

Kelvin Franklin initiated this civil action on August 28, 2023. His Complaint [1] brings

claims under 42 U.S.C. § 1983 and Mississippi state law against the City of Indianola, Mississippi;

Chief Ronald Sampson, in his individual and official capacities; Officer Greg Capers, in his

individual and official capacities; and John Does 1-5, in their individual and official capacities

("the Defendants"). Now before the Court are the Defendants' Motions for Judgment on the

Pleadings or, alternatively, Motions for Summary Judgment [14, 16]. The Motions [14, 16] have

been fully briefed and are ripe for review. The Court is prepared to rule.

*Relevant Factual and Procedural Background*

On December 30, 2022 at approximately 7:45 p.m., Officer Greg Capers of the Indianola

Police Department was dispatched to an Indianola residence in reference to a disturbance.

According to the Complaint [1], Franklin, an active-duty member of the military, traveled

to the Indianola residence that evening from Camp Shelby with his fiancée's cousin. Franklin's

fiancée Sabrina Smith lived at the residence. The Complaint [1] alleges that Franklin intended to

retrieve a bag and return to Camp Shelby as soon as possible.

According to the Complaint [1], when Franklin arrived at the residence, he exited the

vehicle and realized that he forgot his parking decal inside the vehicle. Thus, as Smith's cousin

was leaving the residence, Franklin attempted to stop the vehicle so that he could retrieve his parking decal. The Complaint [1] alleges that Smith misjudged the circumstances of Franklin's attempt to retrieve his decal and called 911. The Complaint [1] further contends that the 911 dispatcher, who was a relative of Smith's, sent Officer Capers to the home.

Per the Complaint [1], when Officer Capers arrived at the residence, Franklin informed Officer Capers that he was only there to retrieve his bag and that he was carrying a firearm. The Complaint [1] alleges that a second "Officer Doe" took possession of Franklin's firearm "but [Franklin] was still denied permission to leave. Instead, [Franklin] was placed in handcuffs by Officer Doe." [1] at p. 4. The Defendants have identified the second officer as Officer Robert Combs.

The Complaint [1] goes on to allege that after Franklin was detained in handcuffs, Officer Capers choked him and tased him three to four times "on the false pretense of resisting arrest." *Id.* According to the Complaint [1], "[a]t all relevant times herein," Franklin alerted the officers that "he was experiencing pain and only had use of one kidney." *Id.* The Complaint [1] contends that Franklin's condition was "deliberately ignored" and that he was transported to the Sunflower County Jail where paramedics evaluated him but did not administer treatment. *Id.* Franklin alleges that he went to the hospital the following day and learned that his kidney was dehydrated.

Franklin subsequently filed suit in this Court. Franklin asserts that the Defendants deprived him of his Fourth and Fourteenth Amendment rights to be free from excessive force.[1] He additionally brings numerous state law claims.

The Defendants filed an Answer [9] on October 26, 2023. Attached to the Answer [9] is Officer Capers' body camera footage from the December 30, 2022 incident, the 911 call audio,

---

[1] The Court notes that there is some debate as to whether Franklin brings an unlawful detention claim as well. The Court will address this issue below.

and a third exhibit containing multiple documents related to the incident and Franklin's resulting convictions. *See* [9], Ex. 1-3. The exhibits, which the Court will walk through, tell a different story than the one set forth in the Complaint [1].

Beginning with the 911 call, the 911 operator answers the phone and twice states, "Indianola PD." [9], Ex. 2 at 0:01-0:10. After hearing no response for 10 seconds, the operator asks, "Brina?" *Id.* at 0:11. The caller, apparently Sabrina Smith, responds, "Brittany, he outside the door. Send a [sic] officer over here." *Id.* at 0:12-0:17. Though Smith does not identify herself or tell the operator that the man outside her door is Franklin, Smith and the operator clearly seem to know each other, and later on in the call, the operator informs the officer over the radio that the subject is Kelvin Franklin. *See id.* at 3:30.

Smith tells the operator, "He standin' outside my door with his gun." *Id.* at 0:29-0:31. The operator can be heard dispatching an officer to Smith's address "in reference to a disturbance" and informing the officer that a male subject is standing outside a female's door with a gun. *Id.* at 0:45-1:01.

Smith and the operator begin to have a conversation wherein Smith conveys to the operator that Franklin had been trying to fight her cousin and a guest who were in a truck outside. *Id.* at 1:13-1:57. The operator asks Smith, "You been left him, right?" *Id.* at 1:57-2:00. Smith confirms that the two are broken up, but Franklin had been there earlier in the day to wash his clothes. *Id.* at 2:01-2:11. As she is explaining this, she shouts, "Don't open my door! Don't open my door!" *Id.* at 2:12-2:15. Smith returns to the call and states that Franklin, wanting to fight, was "asking them what's up" and "pulled his gun out." *Id.* at 2:26-2:29.

Smith then tells the operator that Franklin has been drinking, which the operator conveys to the responding officer. *Id.* at 2:55-3:21. The officer responds inaudibly, and the operator informs

3

him that the subject's name is Kelvin Franklin. *Id.* at 3:30. Around this time, a child can be heard in the background indicating that the police have arrived. *Id.* at 3:01-3:11.

This brings the Court to Officer Caper's body camera footage, which begins as Capers pulls up to Smith's residence. When Officer Capers arrives, he asks dispatch what the male subject's name is, and dispatch responds "Kelvin Franklin." [9], Ex. 1 at 0:47-0:54. Capers radios back, "That's what I thought." *Id.*

As Officer Capers approaches the front door where Franklin is standing, Capers says, "What's going on Franklin?" and Franklin responds, "What's up, what's up man, I'm just tryin' to get [inaudible]." *Id.* at 1:00-1:02. Then the following exchange occurs:

> Capers: Man, you got a gun out here?
>
> Franklin: Huh?
>
> Capers: You got a gun out here?
>
> Franklin: Man, you know I tote - I stay with my heat.
>
> Capers: You got it on you now?
>
> Franklin: Man, you know I stay with my heat.
>
> Capers: Man, you can't be comin' over here with that.
>
> Franklin: Man, it ain't that.
>
> Capers: Let me see it for the time being. You can get it back.
>
> Franklin: Nah, man. Look, look, look [clapping his hands]. I just came from Hattiesburg from training. I come over –
>
> Capers: Listen, you can't be out here with no gun.
>
> Franklin: I ain't got no gun on me.
>
> Capers: You got it on you, don't you?
>
> Franklin: No, I don't.

4

*Id.* at 1:03-1:23.

As Franklin denies that he has a gun, he tugs at his shirttail and appears to adjust something in his waistband. *Id.* at 1:22-1:23. Officer Capers tells Franklin, "Don't do that. Don't reach. Don't reach." *Id.* at 1:24. Franklin turns away from Capers and begins to walk away, saying "I ain't reachin'." *Id.* at 1:25. Officer Capers, remaining where he is, tells Franklin, "Hey man, you already got it. If it's not in a holster, you're in trouble." *Id.* at 1:26-1:30. Franklin then turns back towards Officer Capers and begins walking towards him with his arms outstretched wide by his sides, palms facing Capers. *Id.* Franklin says, "Man, I ain't even reach. Come on man, you know me better than that." *Id.* 1:31-1:32. Capers responds, "You're darn right. So you know I don't play like that." *Id.* at 1:32.

As Franklin repeats that he is there to get his bag, Officer Capers directs Officer Combs to get the gun off of Franklin. *Id.* at 1:34-1:38.[2] At this point, Officer Capers has his firearm pointed in Franklin's direction. *Id.* at 1:38. Franklin turns and begins to walk away from the house towards the street. *Id.* Officer Capers tells him, "Franklin, don't make no moves." *Id.* at 1:39-1:40. Franklin continues walking towards the street and says, "Shoot me." *Id.* at 1:41.

As Officer Capers begins to follow Franklin towards the street, he says again, "Franklin, don't make no moves." *Id.* at 1:41-1:42. Franklin, continuing to walk towards the street, responds, "You can shoot me, bro. You can shoot me." *Id.* at 1:43-1:44. As Officer Capers nears the street, he swaps his firearm for his taser. *Id.* at 1:45-1:49.

Nearing the street, Franklin briefly pauses at a truck that is parked in front of the house and turns towards Officer Capers. Approaching Franklin, Officer Capers tells him, "If you got a

---

[2] It is unclear from the video at what point Officer Combs arrived on the scene. However, it appears that Officer Combs arrived shortly after Officer Capers, as Officer Capers had been at the residence for less than three minutes at this point.

weapon on you, we need to see it. You finna get tased." *Id.* at 1:51-1:53. Franklin then turns and walks away into the street. *Id.* at 1:54-1:55.

As Officer Capers follows Franklin into the street, he tells him again that he is about to be tased. *Id.* at 1:56. Franklin, now in the street with his back turned to Capers, exclaims that he just wants to get his bag, and Officer Capers says again that he is about to be tased. *Id.* at 1:57-1:58.

Once Officer Capers meets Franklin in the street, Capers tells Franklin four times to put his hands up. *Id.* at 1:59-2:09. Franklin's hands remain by his side. *Id.* Officer Capers tells Franklin, "You reach for that gun, you're gonna be in trouble. I promise you." *Id.* at 2:07.

As Capers says this to Franklin, Officer Combs begins to approach Franklin from the other side. *Id.* at 2:07-2:09. Officer Combs removes the gun from Franklin's side and pats down Franklin's waistband. *Id.* at 2:10-2:18. Combs asks Franklin, who is still standing with his hands by his side, if he has any other weapons on him, and Franklin responds that he does not. *Id.*

When Officer Combs has retrieved the firearm and takes a step back from Franklin, Franklin turns towards Officer Capers, raises his arm, and points at Capers, saying, "Man, you [inaudible]." *Id.* at 2:19. Officer Combs tells Franklin, "He's just doin' his job, bro." *Id.* at 2:20-2:21. Franklin turns towards Combs with his arms outstretched and palms facing up, telling Combs, "I ain't did nothin'." *Id.* at 2:21-2:24. Officer Combs asks Franklin, "Well do you live here?" *Id.* at 2:25. Franklin, gesturing towards the house, shouts, "Man, yeah, I leave my clothes in here." *Id.* at 2:26-2:28.

As Franklin is still turned towards Combs, Officer Capers asks Franklin three times if he has a holster and tells Franklin three times to put his hands down. *Id.* at 2:20-2:26. When Franklin says that he still lives there, Officer Capers says, "You used to live here." *Id.* at 2:27-2:28. Franklin then turns back towards Capers, claps his hands and shouts, "I still live here, man." *Id.* at 2:29-

2:30. Officer Capers again suggests that Franklin does not live there and asks if Franklin has a holster. *Id.* at 2:30-2:32. When Officer Combs says something inaudible, Franklin turns back towards him and again shouts that he is just trying to get his bag. *Id.* at 2:31-2:35.

At this point, Officer Capers tells Officer Combs, "If he don't have a holster, put the cuffs on him." *Id.* at 2:36-2:37. Franklin looks at Capers briefly and again turns to tell Combs, who is now walking away towards the police car, "Man, I'm just tryin' to get my bag." *Id.* at 2:40.[3] Officer Capers tells Franklin to "hold on," and Franklin turns his back away from Capers and begins to walk toward the driveway. *Id.* at 2:42-2:45.

Franklin then quickly turns back around and begins to walk toward Capers. *Id.* at 2:45-2:50. As Franklin inches toward Capers with his arms out wide by his sides, Officer Capers tells Franklin to "hold on" eight times. *Id.* Franklin says three times, "What's up with you?" *Id.* at 2:49-2:50. Officer Capers tells Franklin, who is now standing right in front of him, "You know I don't play like that. Back up. Don't walk up on me." *Id.* at 2:50-2:52. Franklin tells Officer Capers, "I'm not playin' with you either." *Id.* at 2:52-2:53. Officer Capers backs up and tells Franklin twice more, "Don't walk up on me again." *Id.* at 2:54-2:56.

Franklin then turns and begins to walk towards the driveway again. *Id.* at 2:57-2:58. Officer Capers, with his taser still pointed at Franklin, says, "I tell you what, keep on movin'." *Id.* at 2:58-2:59. Franklin again turns around and begins to walk towards Capers with his arms wide by his sides, telling Capers, "I ain't doin' shit." *Id.* at 3:00-3:01. As Capers is holding his taser and telling Franklin to back up, Franklin shouts four times, "Do it." *Id.* at 3:01-3:04. Franklin then directs a bystander to start recording, turns back towards Capers, and says, "Do it. Do it. I ain't did shit to you, bro. I'm the one that called you." *Id.* at 3:05-3:11.

---

[3] At this point, Officer Combs turns to walk towards his police vehicle and does not return until he comes back to handcuff Franklin, as will be discussed below.

As Franklin says this, Officer Capers tells him to back up. *Id.* at 3:09-3:10. When Franklin suggests to Capers that he is the one that called the police, Capers says, "It don't matter. You got a concealed weapon." *Id.* at 3:11-3:12. Franklin, arms still out wide by his sides, says, "What's wrong with you, bro? I just came from Grenada. What's up with you?" *Id.* at 3:13-3:16. Capers tells Franklin again, "It don't matter. You got a concealed weapon. You finna get lit up." *Id.* at 3:14-3:16. Franklin then steps towards Capers and says, "Man, then light me up," and Capers deploys the taser as Franklin steps towards him. *Id.* at 3:17-3:18.

When Franklin is tased, he takes several steps backward and pulls the taser prongs off of his shirt. *Id.* at 3:18-3:22. Franklin then stands upright in the street for several seconds as Officer Capers shouts for Officer Combs. *Id.* at 3:23-3:33.

As Officer Combs approaches Franklin from behind, Franklin bends forward and turns his body to look behind him. *Id.* at 3:34-3:37. As Combs approaches him, he tells Franklin, "Hold tight, bro." *Id.* When Combs reaches Franklin, Franklin turns and lays on his back on the ground. *Id.* At this point, Franklin is for the most part no longer visible in the frame of the body camera footage. However, when Officer Combs reaches down to handcuff Franklin, one of Franklin's hands is in the frame as it is being grasped by Combs' hands. *Id.* at 3:38-3:40.

Franklin can be heard whimpering, and Officer Combs can be seen from the waist up bent over Franklin. *Id.* at 3:41-3:43. Officer Capers tells Franklin twice to put his hands behind his back, and Officer Combs says, "Let me see your hands, bro." *Id.* at 3:44-3:54.

Seconds later, part of Franklin's body becomes visible in the frame. *Id.* at 3:57. Franklin is in the fetal position, laying on his right side with his right arm tucked underneath his left arm. *Id.* at 3:58-3:59. Officer Combs' hands are underneath Franklin's left arm. *Id.* Franklin can be heard breathing heavily. *Id.* The camera moves and Franklin is no longer visible again.

Officer Capers tells Franklin, "Put your hands behind your back. You're finna get it again." *Id.* at 4:00-4:02. Officer Combs also tells Franklin that he is going to be tased again and to "stop resisting." *Id.* at 4:03-4:05.

Officer Capers bends over and shines his flashlight towards Franklin, making Franklin fully visible in the frame. *Id.* at 4:07. Again, he is laying in the fetal position on his right side. *Id.* His left hand is tucked under his right armpit, and his left wrist has a handcuff around it. *Id.* His right arm is tucked underneath his left arm, and Officer Combs' hands are underneath his left arm. *Id.*

Franklin is still whimpering. *Id.* at 4:08. Officer Capers, holding his taser to Franklin's leg, instructs him to put his hands behind his back twice more. *Id.* at 4:08-4:13. Officer Combs tells Franklin again, "Stop resisting, bro." *Id.* at 4:13-4:14. Officer Capers says, "Put your hands behind your back," and drive stuns Franklin's left thigh. *Id.* at 4:15-4:16. Franklin whimpers louder and raises his left arm to push the taser away, revealing Officer Combs' hands trying to secure the handcuff around Franklin's right wrist. *Id.* at 4:16-4:20. When Franklin's left arm moves out of the way, Officer Combs adjusts the handcuff on his right wrist, stands up, and says, "We good," appearing to indicate that the handcuffs were secured, though they were secured in front of Franklin's body, rather than behind his back. *Id.* at 4:21.[4]

After Franklin is handcuffed, the officers instruct him to stand up and get in the police car. *Id.* at 4:50-8:30. Franklin consistently asserts that he is in pain and remains on the ground. *Id.* At the 5:37 mark, Franklin indicates that he only has one kidney. Eventually, three officers lift him

---

[4] The Court notes that Franklin submitted a video taken by a bystander standing at the truck that was parked in front of the residence. *See* [20], Ex. 1. The video begins just as Franklin is tased. The video shows that after Franklin is tased, Officer Combs approaches Franklin and immediately takes Franklin's hand and begins trying to place handcuffs on him. *Id.* at 0:18-0:23. Seconds after Officer Combs begins trying to handcuff Franklin, the bystander walks around the truck and continues recording from a different vantage point. *Id.* at 0:28. Due to the lights from the police vehicle and the distance from which the bystander is recording, the details of the incident up until the drive-stun maneuver—in particular, the placement of Officer Combs' hands and Franklin's hands—are not clear. *See id.* 0:28-1:00.

into the police car. *Id.* at 8:30. The identity of the third officer and the time that he arrived on the scene is unclear.

On the way to the county jail, Officer Capers tells dispatch to send MedStat to the jail to evaluate Franklin. *Id.* at 10:37. Once at the county jail, Officer Capers repeatedly instructs Franklin to exit the vehicle, but Franklin continues to assert that he is hurt and remains in the vehicle. *Id.* at 13:00-19:00. At one point, Franklin tells Capers, "I just came from training, bro. She called me over there," and Capers responds, "Well you should have stayed away. Y'all stay into it all the time." *Id.* at 16:08-16:20. When the MedStat ambulance arrives, they lift Franklin onto a stretcher, and he is driven away in the ambulance. *Id.* at 19:04-21:27.

Franklin subsequently pleaded guilty to disorderly conduct in violation of MISS. CODE ANN. § 97-35-7(1), which prohibits the failure or refusal to comply with an officer's directive. Franklin was additionally found guilty of carrying a concealed weapon in violation of MISS. CODE ANN. § 97-37-1 and simple assault on a police officer in violation of MISS. CODE ANN. § 97-3-7(1)(a).

In their present Motions [14, 16], the Defendants seek dismissal of all claims asserted against them. Specifically, the Defendants contend that all of Franklin's federal claims are barred by *Heck* because they necessarily challenge the facts of his convictions. Alternatively, the Defendants contend that Officer Capers is entitled to qualified immunity and that Franklin has failed to identify an official policy necessary to hold the City and/or Chief Sampson liable for an alleged constitutional violation.

Further, the Defendants contend that all of Franklin's state law claims are procedurally barred for failure to provide notice as required by the Mississippi Tort Claims Act ("MTCA"). Alternatively, the Defendants assert a number of defenses available under the MTCA.

Franklin has responded in opposition to the Motions [14, 16].

*Legal Standard*

The Court first must determine the appropriate standard to apply to the Motions [14, 16]. The Defendants move for judgment on the pleadings under Rule 12(c) or, alternatively, summary judgment under Rule 56.

"In considering a motion for judgment on the pleadings under Rule 12(c), the court is generally limited to 'the contents of the pleadings, including attachments thereto.'" *Bosarge v. Miss. Bureau of Narcotics*, 796 F.3d 435, 440 (5th Cir. 2015) (quoting *Brand Coupon Network, L.L.C. v. Catalina Mktg. Corp.*, 748 F.3d 631, 635 (5th Cir. 2014)). "If . . . matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." FED. R. CIV. P. 12(d).

"The 'pleadings' include the complaint, answer to the complaint, and 'if the court orders one, a reply to an answer.'" *Bosarge*, 796 F.3d at 440 (quoting FED. R. CIV. P. 7(a)). Documents attached to a motion to dismiss under Rule 12(b)(6) or a motion for judgment on the pleadings under Rule 12(c) are also considered part of the pleadings "if they are referred to in the plaintiff's complaint and central to [his] claim." *Id.* (citing *Causey v. Sewell Cadillac-Chevrolet, Inc.*, 394 F.3d 285, 288 (5th Cir. 2004); *Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002)).

In addition to the pleadings and their attachments, on a motion under Rule 12(c), the Court may consider matters of public record and any matters of which it may take judicial notice. *D.M. v. Forrest Cnty. Sheriff's Dep't*, 2020 WL 4873486, at *2 (S.D. Miss. Aug. 19, 2020) (citing *Davis v. Bayless*, 70 F.3d 367, 372 n. 3 (5th Cir. 1995); *Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011)).

Here, as noted, the Defendants attached to their Answer [9] Officer Capers' body camera footage, the 911 call audio, and a third exhibit containing multiple documents related to the incident and Franklin's convictions. The third exhibit includes a booking report, probable cause affidavits, arrest warrants, warrant reports, a municipal court criminal summons, an incident report, and the "Abstract of Court Record" showing the disposition of the charges brought against Franklin. *See* [9], Ex. 3. These exhibits were attached to a pleading and may be considered without requiring conversion of the Motions [14, 16].

To his response to the Motion [16] regarding his federal claims, Franklin attached a video of the incident recorded by a bystander. The bystander's video, if considered, would not require conversion because it was referred to in Franklin's Complaint [1]. *See Walch v. Adjutant General's Dep't. of Tex.*, 533 F.3d 289, 293-94 (5th Cir. 2008) (allowing consideration of documents attached to a plaintiff's opposition to motion to dismiss where the documents were sufficiently referenced in the complaint and neither party questioned their authenticity).

To his response to the Motion [14] regarding his state law claims, Franklin attached the bystander's video and a Notice of Claim. The Notice, if considered, would require the Court to convert the Motion [14] to a motion for summary judgment because it was not attached to a pleading or the Motion [14], nor is it a matter of public record or a matter of which the Court may take judicial notice. *See Bosarge*, 796 F.3d at 440; *D.M. v. Forrest Cnty. Sheriff's Dep't*, 2020 WL 4873486, at *2. The Court intends to consider the Notice and therefore treats the Defendants' Motions [14, 16] as motions for summary judgment.[5]

---

[5] While the Court is only required to convert the Motion [14] pertaining to Franklin's state law claims, the Motions [14, 16] relate to the dismissal of Franklin's Complaint [1] in its entirety. The Court is considering the Motions [14, 16] together and therefore treats both Motions [14, 16] as motions for summary judgment.

*Analysis and Discussion*

The Court will begin with Franklin's federal claims before turning to his state law claims.

I.      *Federal Claims*

The Defendants contend that all of Franklin's federal claims are *Heck*-barred. They raise alternative bases for dismissal as well. The Court will address each argument in turn.

A.   *Heck*

"*Heck* prohibits suits under § 1983 if success on the claim would necessarily imply that a prior conviction or sentence is invalid." *Aucoin v. Cupil*, 958 F.3d 379, 382 (5th Cir. 2020) (citing *Heck v. Humphrey*, 512 U.S. 477, 486-87, 114 S. Ct. 2364, 129 L. Ed. 2d 383 (1994)). Thus, to proceed on a section 1983 claim where the alleged constitutional violation arose from the same facts attendant to the charge for which he was convicted, the plaintiff must prove the prior conviction has been "reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus." *Id.* (citing *Heck*, 512 U.S. at 487, 114 S. Ct. 2364). "That is because we do not allow the use of § 1983 to collaterally attack a prior criminal proceeding, out of concern for finality and consistency." *Id.* at 380.

"But if the 'plaintiff's action, even if successful, will *not* demonstrate the invalidity of any outstanding criminal judgment against the plaintiff,' the claim implicates none of these concerns and may therefore proceed." *Id.* at 382 (quoting *Heck*, 512 U.S. at 487, 114 S. Ct. 2364) (emphasis in original). "Determining whether the § 1983 claim challenges the conviction is 'fact-intensive, requiring us to focus on whether success on the . . . claim requires negation of an element of the criminal offense or proof of a fact that is inherently inconsistent with one underlying the criminal conviction.'" *Id.* (quoting *Bush v. Strain*, 513 F.3d 492, 497 (5th Cir. 2008)). Where a complaint

13

describes "a single violent encounter in which the plaintiff claimed he was an innocent participant" and those allegations are inconsistent with his conviction, *Heck* bars his excessive force claims. *Ducksworth v. Rook*, 647 F. App'x 383, 386 (5th Cir. 2016) (citing *Daigre v. City of Waiveland*, 549 F. App'x 283, 286 (5th Cir. 2013) in turn citing *DeLeon v. City of Corpus Christi*, 488 F.3d 649, 656-57 (5th Cir. 2007)). "Section 1983 claims that are temporally and conceptually distinct from the excessive force claim, however, are not barred by *Heck*." *Id.* (citing *Walter v. Horseshoe Entm't*, 483 F. App'x 884, 887 (5th Cir. 2012)). "Put simply, there is no *Heck* bar if the alleged violation occurs 'after' the cessation of the plaintiff's misconduct that gave rise to his prior conviction." *Aucoin*, 958 F.3d at 382; *see also Bush*, 513 F.3d at 495-500 (where plaintiff was convicted of resisting arrest, *Heck* did not bar claims for excessive force occurring *after* she was restrained and ceased resistance).

Here, it is undisputed that Franklin was convicted of disorderly conduct in violation of MISS. CODE ANN. § 97-35-7(1), carrying a concealed weapon in violation of MISS. CODE ANN. § 97-37-1, and simple assault on a police officer in violation of MISS. CODE ANN. § 97-37-1. His Complaint [1] alleges as follows:

> 14. Furthermore, Mr. Franklin informed Defendant Officer Capers and Doe that he was carrying a firearm. Defendant Officer Doe took possession of Plaintiff's firearm, but Plaintiff was still denied permission to leave. Instead, he was placed in handcuffs by Officer Doe.
>
> 15. Suddenly, Defendant Officer Capers withdrew his firearm and directed it towards Plaintiff. Plaintiff stated "why would you want to shoot me. I haven't done anything for you to shoot me." Defendant Officer Capers put the gun back in his holster and grabbed his taser.
>
> 16. While Plaintiff was detained in handcuffs, Defendant Officer Capers tased him three to four times on the false pretense of resisting arrest, despite Mr. Franklin already being detained. Defendant Officer Capers also choked Plaintiff while he was detained in

> handcuffs. The incident was recorded by body camera footage and
> a personal recording.

[1] at p. 4.

The Complaint's [1] suggestion that Franklin should have been allowed to leave after officers retrieved his firearm implies that Franklin was not lawfully detained for carrying a concealed weapon. Further, the Complaint's [1] statement that Franklin was tased "on the *false pretense* of resisting arrest" necessarily implies that Franklin complied with the officer's directives and that his conviction for disorderly conduct was invalid. [1] at p. 4 (emphasis added); *see* MISS. CODE ANN. § 97-35-7(1) (disorderly conduct statute prohibiting the failure or refusal to comply with an officer's directive).

Franklin's Complaint [1] does not separate the facts of Franklin's convictions from the facts of his excessive force claim. Instead, he presents his factual allegations as a "single violent encounter" in which he was an innocent participant. *See DeLeon*, 488 F.3d 656-57 (concluding that *Heck* barred excessive force claim where complaint described "single violent encounter" in which plaintiff claimed he was innocent and necessarily challenged his conviction).[6] Franklin's excessive force claim challenges the facts underlying his convictions, and this is precisely the type of claim that *Heck* bars. *See Rogers v. Jones*, 71 F. App'x 441, at *1 (5th Cir. 2003) (where plaintiff's complaint and testimony denied that plaintiff attempted to resist officers, Fifth Circuit held that he challenged facts essential to his disorderly conduct conviction under MISS. CODE ANN. § 97-35-7 and that *Heck* barred his excessive force claim); *Williams v. McDonough*, 2023 WL 273343, at *3 (5th Cir. 2023) (concluding that *Heck* barred excessive force claim where "complaint [did not] concede that [plaintiff] resisted arrest at beginning of incident" but instead contended that

---

[6] The Court notes that, in his Response Memorandum [21], Franklin makes the conclusory assertion that "Defendants' conduct is temporally and conceptually distinct from the basis of Plaintiff's conviction," but he provides no further analysis or factual support for this contention. [21] at p. 6-7.

15

he "fully complied with the [Officers'] commands"); *Ducksworth*, 647 F. App'x at 386 (concluding that *Heck* barred excessive force claim where complaint made no mention of the conduct underlying plaintiff's arrest and offered "no differentiation of his behavior before and after he was restrained"); *Daigre*, 549 F. App'x at 287 (concluding that *Heck* barred excessive force claim where plaintiff's complaint demonstrated that she "still thinks she is innocent" and her "broad claims of innocence related to the entire arrest encounter, and not merely a discrete part of it"); *Arnold v. Town of Slaughter*, 100 F. App'x 321, 324 (5th Cir. 2004) (concluding that *Heck* barred plaintiff's excessive force claim where he "claim[ed] that he did nothing wrong, but was viciously attacked for no reason"); *Whatley v. Coffin*, 496 F. App'x 414, 417 (5th Cir. 2012) ("We need not determine whether [plaintiff's] excessive force claims undermines an element of his assault of a public servant convictions because the facts alleged in his complaint were inherently inconsistent with those convictions.").

Additionally, while Franklin in his Response Memorandum [21] contends that his "charges and conviction [sic] were flawed," he maintains that he "is **not** asserting, **at this time**, that the convictions were invalid." [21] at p. 4, 7 (emphasis in original). The Court notes that the allegations of the Complaint [1] are "conclusively binding" and necessarily challenge the factual determinations underlying his convictions. *See Williams*, 2023 WL 2733443 at *3 (complaint's allegation that plaintiff fully complied with officers' commands was "conclusively binding") (citing *Davis v. A.G. Edwards & Sons, Inc.*, 823 F.2d 105, 108 (5th Cir. 1987)). Therefore, Franklin's assertion that he is not attempting to invalidate his convictions is immaterial; the Complaint's [1] allegations are inherently incompatible with his convictions and therefore *Heck*-barred. *See Aucoin*, 958 F.3d at 383 (citing *Okoro v. Callaghan*, 324 F.3d 488, 490 (7th Cir. 2003) ("It is irrelevant that [a plaintiff] disclaims any intention of challenging his conviction; if he makes

16

allegations that are inconsistent with the conviction's having been valid, *Heck* kicks in and bars his civil suit.")).

For these reasons, the Court finds that Franklin's federal claims are *Heck*-barred and must be dismissed *with prejudice* until the *Heck* conditions are satisfied. *See Johnson v. McElveen*, 101 F.3d 423, 424 (5th Cir. 1996) (claim dismissed under *Heck* is properly "dismissed with prejudice . . . until the *Heck* conditions are met").[7]

Nevertheless, the Court will consider the Defendants' alternative arguments in favor of dismissal so that Franklin will know whether he may proceed should the *Heck* preconditions be satisfied in the future. *See Castille v. State*, 1999 WL 544684, at *3 (E.D. La. July 27, 1999) (citing *McGrew v. Tex. Bd. of Pardons & Paroles*, 47 F.3d 158, 161 (5th Cir. 1995)) (even where plaintiff failed to satisfy *Heck* rule, court alternatively considered qualified immunity defense to "allow [plaintiff] to know whether he will never have a claim against the Section 1983 individual defendants"); *see also Wright v. La. State*, 2023 WL 3585228, at *1 n. 4 (E.D. La. May 22, 2023) (same).

## B. Section 1983 Claims - Generally

While Franklin asserts different theories of liability, such as individual liability, supervisory liability, and *Monell* liability, he substantively brings an excessive force claim under each theory.

---

[7] As noted above, there is some dispute as to the nature of Franklin's federal claims. Franklin's Complaint [1] styles his federal claims as follows: Count One, Violation of Fourth and Fourteenth Amendment Rights under Section 1983; Count Two, Excessive Force. *See* [1] at p. 5. The Defendants contend that Franklin attempts to bring an unlawful seizure claim based on an unlawful detention for the first time in his Response [20]. Under "Facts," the Complaint [1] states that the officers confiscated Franklin's firearm "but [he] was still denied permission to leave." *Id.* at p. 4. In his Response Memorandum [21], he more specifically alleges (for the first time) that he was detained without probable cause. *See* [21] at p. 7. To the extent Franklin intended to bring an unlawful seizure claim based on an unlawful detention, it is undoubtedly *Heck*-barred because (as discussed above) the Complaint's [1] allegations necessarily challenge his conviction for carrying a concealed weapon.

"Regarding Section 1983, the United States Supreme Court has held that the statute's 'very purpose. . . was to interpose the federal courts between the States and the people, as guardians of the people's federal rights—to protect the people from unconstitutional action *under color of state law*.'" *Alexander v. McAdams*, 2017 WL 5642328, at *3 (N.D. Miss. Apr. 18, 2017) (quoting *Mitchum v. Foster*, 407 U.S. 225, 242, 92 S. Ct. 2151, 32 L. Ed. 2d 705 (1972)) (emphasis in original). To state a claim under Section 1983, a plaintiff must "(1) allege he has been deprived of a right secured by the United States Constitution or the laws of the United States; and (2) demonstrate that the alleged violation was committed by a person acting under color of state law." *Weeks v. Thompson*, 2007 WL 316261, at *2 (N.D. Miss. Jan. 31, 2007) (citing *Cornish v. Corr. Servs. Corp.*, 402 F.3d 545, 549 (5th Cir. 2005)).

There is no debate that different standards are appliable to a Section 1983 claim against a municipality and an individual capacity claim against a law enforcement officer. *See Valle v. City of Houston*, 613 F.3d 536, 541-42 (5th Cir. 2010) (to establish municipal liability under Section 1983, "[a] plaintiff must identify: '(1) an official policy (or custom), of which (2) a policymaker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose 'moving force' is that policy or custom."); *Mangieri v. Clifton*, 29 F. 3d 1012 (5th Cir. 1994) (holding that law enforcement officers are entitled to qualified immunity "unless it is shown that, at the time of the incident, [the officer] violated a clearly established constitutional right."). "However, regardless of whether a plaintiff seeks to impose liability against a municipality or against an individual law enforcement officer, the plaintiff must establish a constitutional violation." *Quinn v. Webster Cnty., Miss.*, 2023 WL 2731037, at *3 (Mar. 30, 2023) (citation omitted). In other words, if Franklin cannot establish a question of fact as to a constitutional violation, he cannot prevail on any of his Section 1983 claims again any defendant. As such, the

Court will begin its analysis with whether Franklin can survive summary judgment as to the existence of a constitutional violation.

i.    *Excessive Force*

Franklin alleges that Officer Capers violated his Fourth Amendment right to be free from excessive force during a seizure.[8] "[E]xcessive force claims arising from an arrest or investigatory stop invoke the protection provided by the Fourth Amendment . . . against 'unreasonable seizure.'" *Tucker v. City of Shreveport*, 998 F.3d 165, 171 (5th Cir. 2021). "Fourth Amendment jurisprudence, however, has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Id.* (citing *Graham v. Connor*, 490 U.S. 386, 396, 109 S. Ct. 1865, 104 L. Ed. 2 443 (1989)). "Thus, determining whether the force used to effect a particular seizure is 'reasonable' for purposes of the Fourth Amendment requires a careful balancing of the intrusion upon the individual's interests with the countervailing governmental interests at stake." *Id.*

"To prevail on a Fourth Amendment excessive force claim, a plaintiff must show '(1) an injury (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable.'" *Craig v. Martin*, 49 F.4th 404, 409 (5th Cir. 2022) (quoting *Ontiveros v. City of Rosenberg*, 564 F.3d 379, 382 (5th Cir. 2009)). Courts

---

[8] The Defendants contend that while Franklin brings his excessive force claim under both the Fourth and Fourteenth Amendments, claims for excessive force occurring "in the course of an arrest" are properly analyzed under the Fourth Amendment. [17] at p. 19. The Defendants are correct. *See Tyson v. Sabine*, 42 F.4th 508, 515 (5th Cir. 2022) (citing *Graham v. Connor*, 490 U.S. 386, 396, 109 S. Ct. 1865, 104 L. Ed. 2 443 (1989); *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 843, 118 S. Ct. 1708, 140 L. Ed. 2d 1043 (1998)) (claim that officers used excessive force during the course of an arrest should be analyzed under the Fourth Amendment; where neither a search nor seizure occurred, the Fourteenth Amendment applies). To the extent that Franklin brings his excessive force claim pursuant to the Fourteenth Amendment, it is improper. However, the factors governing the "objective reasonableness" of an officer's use of force is the same in both contexts. *Austin v. City of Pasadena, Tex.*, 74 F.4th 312, 322 n. 4 (5th Cir. 2023) (citing *Kingsley v. Hendrickson*, 576 U.S. 389, 396-97, 135 S. Ct. 2466, 192 L. Ed. 2d 416 (2015)) (treating the standards as "interchangeable"). Thus, the Court's analysis remains the same regardless of how Franklin labels his claims.

generally consider the second and third factors together, "as officers must assess not only the need for force, but also the relationship between the need and the amount of force used." *Solis v. Serrett*, 31 F.4th 975, 982 (5th Cir. 2022) (citing *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009)) (internal quotation marks omitted).

"Excessive force claims are necessarily fact intensive; whether the force used is 'excessive' or 'unreasonable' depends on 'the facts and circumstances of each particular case.'" *Craig*, 49 F.4th at 409 (quoting *Deville*, 567 F.3d at 167). *Graham* identifies "three non-exclusive considerations for courts to examine when analyzing the reasonableness of the force used, including 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Solis*, 31 F.4th at 382) (quoting *Graham*, 490 U.S. at 396, 109 S. Ct. 1865).

"Importantly, '[t]he "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Tucker*, 998 F.3d at 171 (quoting *Graham*, 490 U.S. at 396, 109 S. Ct. 1865). "'[N]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,' violates the Fourth Amendment." *Id.* (quoting *Graham*, 490 U.S. at 396, 109 S. Ct. 1865). "Instead, 'the calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.'" *Id.* at 171 (quoting *Graham*, 490 U.S. at 396-97, 109 S. Ct. 1865). "[T]he overarching question is whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them." *Trammell v. Fruge*, 868 F.3d 332, 340 (5th Cir. 2017) (citing *Graham*, 490 U.S. at 397, 109 S. Ct. 1865).

In determining whether a Fourth Amendment violation occurred, "distinct moments of force must be separately analyzed." *Tucker*, 998 F.3d at 175. Therefore, the Court will evaluate Officer Capers' initial use of the taser before turning to the subsequent drive-stun maneuver.

1. *Initial Tase*

Before beginning its analysis, the Court notes that it will primarily rely on Officer Capers' body camera footage. Normally, in deciding a motion for summary judgment, "[a]ll facts must be viewed in the light most favorable to the nonmovant and all justifiable inferences must be drawn in his favor." *Crane*, 50 F.4th at 461 (citing *Darden v. City of Fort Worth*, 880 F.3d 722, 727 (5th Cir. 2018)). "However, if there is video evidence that 'blatantly contradict[s]' the plaintiffs' allegations, the court should not adopt the plaintiffs' versions of facts; instead, the court should view those facts 'in the light depicted by the videotape.'" *Craig*, 49 F.4th at 409 (quoting *Scott v. Harris*, 550 U.S. 372, 380-81, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007)). Importantly though, the Fifth Circuit has cautioned that "a court should not discount the nonmoving party's story unless the video evidence provides so much clarity that a reasonable jury could not believe his account." *Crane*, 50 F.4th at 462 (citing *Darden*, 880 F.3d at 730).

Here, Franklin argues that Officer Capers used excessive force when he choked and "tased [Franklin] three (3) to four (4) times on the false pretense of resisting arrest," despite Franklin already being detained in handcuffs. [21] at p. 9-10. The body camera footage "blatantly contradicts" Franklin's allegations in that it shows Officer Capers tasing Franklin prior to him being handcuffed and it never shows Officer Capers choking Franklin. *See Craig*, 49 F.4th at 409. Therefore, the Court declines to adopt the version of events set forth in the Complaint [1]. In analyzing Franklin's excessive force claim, the Court views the facts "in the light depicted by the videotape." *Id.*

21

With that in mind, the Court turns to whether a constitutional violation occurred. As noted, to prevail on a Fourth Amendment excessive force claim, a plaintiff must show "(1) an injury (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable." *Id.* As to the first element, the Complaint [1] alleges that Franklin suffered from a dehydrated kidney as a result of the incident, and the Defendants do not dispute that Franklin was injured. Thus, the Court will focus its analysis on the reasonableness of Officer Capers' use of force.

The Court finds relevant the Fifth Circuit's 2021 decision in *Cloud v. Stone*, 993 F.3d 379, 384 (5th Cir. 2021). There, Deputy Luker pulled Cloud over for speeding on an interstate in Louisiana. *Id.* at 381-82. When Luker wrote Cloud a ticket, Cloud refused to sign it, which is grounds for arrest under Louisiana law. *Id.* at 382. The Fifth Circuit described the circumstances of Luker's attempt to arrest Cloud as follows:

> [Luker] had Cloud exit his pickup truck and face its side with his hands behind his back. Standing behind Cloud, Luker handcuffed his left wrist, at which point Cloud turned partially around to his left. . . Luker ordered Cloud to turn back around and reached for his right hand to finish handcuffing him. But Cloud then spun all the way around, turning away from Luker's reach and facing him head-on, with the handcuffs hanging from his left wrist.

> With Cloud now facing him, Luker stepped a few feet back and tased Cloud in the chest. Though both taser prongs hit Cloud and began cycling, they did not incapacitate him. Cloud yelled and pulled the prongs from his chest. Luker then released his police dog from his car with a remote button and tried to regain control of Cloud. Luker grabbed Cloud around the waist and tased him again, now with the taser in "drive-stun" mode.

*Id.* at 382.

Applying the *Graham* factors to the plaintiffs' excessive force claim, the Fifth Circuit concluded that Luker's use of force was reasonable. *Id.* at 386-87. The court initially noted that

the first two *Graham* factors—the "severity of the crime at issue" and the "immediate threat to the safety of the officers or others"—were "less illuminating" than the extent of Cloud's resistance. *Id.* at 384. On one hand, Cloud was suspected of a minor offense. *Id.* "On the other hand, Luker was the lone officer on the scene, and Cloud's confrontational manner, culminating in his turning around to face Luker squarely (with one hand uncuffed and the door of his truck open next to him) created some threat to the officer's safety." *Id.*

The court therefore focused on the third *Graham* factor, explaining: "Our cases on police use of tasers have paid particular attention to whether officers faced active resistance when they resorted to a taser. Where, as here, the severity of crime and immediate safety threat are relatively inconclusive, a suspect's active resistance to arrest may justify this degree of force." *Id.* Concluding that "Cloud actively resisted arrest, which gave Luker reasonable grounds to tase him," the Fifth Circuit emphasized the following facts:

> While Cloud's left hand was being handcuffed, he turned partially around. Luker responded by commanding Cloud to turn back around. But when Luker reached for Cloud's right hand, Cloud turned to face him, with the handcuffs dangling from his left wrist. In other words, Cloud took a confrontational stance, deprived Luker of the use of his handcuffs, and thwarted efforts to complete the arrest. . . Up to then, Luker had addressed Cloud's general uncooperativeness and modest resistance with verbal commands and milder force. But at this juncture things took a more serious turn, making Luker's resort to his taser reasonable.
>
> Plaintiffs argue that Cloud's resistance was merely passive, but this mischaracterizes the record. Cloud was more than merely uncooperative or argumentative: his actions—not just his failure to follow directions—prevented Luker from completing a lawful arrest.

*Id.* at 385-86 (internal citation omitted).

The Fifth Circuit additionally concluded that the drive-stun maneuver used after the initial tase was reasonable "[b]ecause Luker's initial tase had no effect... the circumstances justifying force were still present during the drive-stun tasing." *Id.* at 386.

This brings the Court to the facts of this case and the first *Graham* factor—"the severity of the crime at issue." *Graham*, 490 U.S. at 396, 109 S. Ct. 1865. When Officer Capers tased Franklin, he was attempting to arrest Franklin for carrying a concealed weapon in violation of MISS. CODE ANN. § 97-37-1, which is a misdemeanor.[9] As noted in *Cloud*, minor crimes generally weigh against the use of force. *See Cloud*, 993 F.3d at 382; *see also Trammel*, 868 F.3d at 340 (misdemeanor was a "minor offense militating against the use of force"). However, in the Court's view, the fact that the officers were dispatched to the home in reference to Franklin causing a disturbance while drinking and carrying a firearm increases the severity of the crime at issue. With that being said, the Court nevertheless finds that this factor does not weigh heavily either way.

The second *Graham* factor requires the Court to consider "whether [Franklin] pose[d] an immediate threat to the safety of the officers or others." *Graham*, 490 U.S. at 396, 109 S. Ct. 1865. When the 911 operator dispatched Officer Capers to Smith's residence, she informed him that Franklin was standing outside of the house with a gun and had been drinking. [9], Ex. 2 at 0:47-1:00, 3:17-3:30. Though Franklin no longer had the firearm on his person when Officer Capers tased him, Franklin was becoming increasingly combative as the interaction went on.

After Officer Combs retrieved the firearm, Franklin immediately turned towards Officer Capers, pointed at him, and began to accuse him of something, though his accusation was inaudible on the body camera footage. [9], Ex. 1 at 2:18-2:21. Approximately 20 seconds later, Franklin

---

[9] The Court notes that carrying a concealed weapon may be a felony under certain conditions set forth in the statute. *See* MISS. CODE ANN. § 97-37-1. However, the booking report indicates that Franklin was charged with a misdemeanor. *See* [9], Ex. 3 at p. 2.

began to walk towards Capers in a confrontational manner with his arms out wide by his sides, asking Capers "What's up with you, man?" *Id.* at 2:42-2:55. When Officer Capers told Franklin, "You know I don't play like that. Back up. Don't walk up on me," Franklin insisted, "I'm not playin' with you either." *Id.* at 2:50-2:53.

Franklin's confrontational tone escalated when he began walking toward Capers antagonistically shouting, "Do it." *Id.* at 3:00-3:07. Each time Officer Capers told Franklin to back up or stop walking toward him, Franklin remained in place or continued to walk toward him. When Franklin was walking toward Officer Capers, Officer Combs was at least several yards away at the police car. Franklin was tased the moment he took a forceful step toward Officer Capers and shouted, "Man, then light me up." *Id.* at 3:15-3:20. A reasonable officer could have perceived Franklin to be a threat to his safety. *See Cloud*, 993 F.3d at 382 (Cloud posed "some threat" to officer safety where he took confrontational stance and officer was the lone officer on the scene). The second *Graham* factor favors Officer Capers.

The last factor concerns whether Franklin was actively resisting arrest or attempting to evade arrest by flight. *See Graham*, 490 U.S. at 396, 109 S. Ct. 1865. Franklin was generally uncooperative during the encounter; he attempted to walk away from Officer Capers five times. He repeatedly asserted that he had done nothing wrong. When Officer Capers instructed Officer Combs to handcuff Franklin and Franklin began to walk away, Officer Capers told Franklin eight times to hold on. Most importantly, at the time Officer Capers tased Franklin, Franklin's confrontational behavior—namely, taking a forceful step toward Officer Capers while shouting at him to tase him—was preventing Officer Capers from completing a lawful arrest. A reasonable officer could have believed that Franklin was actively resisting arrest. *See Cloud*, 993 F.3d at 385-

86 (Cloud actively resisted arrest when he took a confrontational stance that prevented the officer from handcuffing him). The third *Graham* factor favors Officer Capers.

In addition to the *Graham* factors, "the speed with which an officer resorts to force is relevant in determining whether that force was excessive to the need." *Trammel*, 868 F.3d at 342. In *Cloud*, the Fifth Circuit emphasized that Deputy Luker "addressed Cloud's general uncooperativeness and modest resistance with verbal commands and milder force" until Cloud took a confrontational stance. 993 F.3d at 386. The Fifth Circuit ultimately found that Luker reasonably resorted to his taser because he deployed it when "things took a more serious turn." *Id.* Here, Officer Capers gave Franklin verbal commands throughout the encounter. When Franklin was tased, Capers had told him multiple times to back up and stop walking toward him or he would be tased. As in *Cloud*, Officer Capers deployed his taser at the moment Franklin took a more forceful step toward him, making his resort to use of force reasonable. *See id.*; *see also Betts v. Brennan*, 22 F.4th 577, 583-84 (5th Cir. 2022) (where driver adopted confrontational stance, repeatedly ignored commands, questioned officer's authority, and dared officer to tase him, court found use of taser reasonable because, *inter alia*, officer tased driver "when all. . . lesser options appeared to have failed").

Considering the totality of the circumstances—specifically, the *Graham* factors and the fact that Officer Capers did not immediately resort to the use of force—the Court finds that Officer Capers' initial use of the taser was reasonable and did not violate the Fourth Amendment.

This brings the Court to Officer Capers' use of the drive-stun maneuver. *See Tucker*, 998 F.3d at 175 (explaining that "two distinct moments of force must be separately analyzed").

2. *Drive-stun Maneuver*

As described above, after Office Capers tased Franklin, Franklin removed the taser prongs from his shirt and stood for several seconds before laying down in the street. Once he laid down in the fetal position, his hands were tucked under his arms, which prevented Officer Combs from handcuffing him. After both officers instructed him to put his hands behind his back and stop resisting, Officer Capers drive-stunned Franklin's thigh.

Turning to the first *Graham* factor, as noted above, Franklin was under arrest for a minor offense, though the circumstances of the incident (i.e., his alleged drinking and causing a disturbance with a firearm) were more concerning than a typical misdemeanor offense. As to the second *Graham* factor, Franklin did not pose an obvious safety threat while in the fetal position on the ground. These factors are relatively inconclusive. Therefore, the Court will focus its analysis on whether Franklin was actively resisting arrest at the time he was drive-stunned. *See Cloud*, 993 F.3d at 384 (where first two factors are relatively inconclusive, court paid particular attention to whether arrestee was actively resisting arrest). At the outset, the Court notes that resistance alone may justify the use of force. *See Solis*, 31 F.4th at 983 (citing *Betts*, 22 F.4th at 582) (finding that the first two *Graham* factors—described as "less salient"—weighed against the officers, but use of force was still reasonable where only the third factor weighed in their favor).

Franklin could argue that, viewing the video in the light most favorable to him, a reasonable jury could conclude that he was not actually resisting arrest at the time that he was drive-stunned, given that he was in the fetal position and whimpering in a high-pitched voice, "I ain't do nothin' to you." [9], Ex. 1 at 3:40-3:45. However, the question before the Court is what a reasonable officer in Officer Capers' position would have perceived. Faced with a similar argument in the 2016 case of *Griggs v. Brewer*, the Fifth Circuit explained as follows:

Grigg's first argument—that he was not resisting, but merely lost his balance—falls short. Although he is correct that, based on his testimony and the ambiguities in the video, a reasonable jury might find that he was not *actually* resisting arrest, that is not the proper inquiry in this appeal. A court must measure the force used under the facts as a reasonable officer *would perceive them*, not necessarily the historical facts. *Hill v. Carroll Cnty., Miss.*, 587 F.3d 230, 234 (5th Cir. 2009) (emphasis added). "For that reason, when reviewing a grant of summary judgment in the Fourth Amendment context, after first construing disputed historical facts in favor of the non-movant, the court must then ask how a reasonable officer would have perceived those historical facts." *Id.* Here, we must conclude that, under the totality of the circumstances—that is, a late-night traffic stop involving a clearly drunk and obstinate individual, lurching to the side and stating "no, no," *in the act* of being handcuffed, immediately following the command to "put your hands behind you back"—Grigg's actions would, to a reasonable police officer, amount to resistance to arrest.

841 F.3d 308, 313-14 (5th Cir. 2016) (emphasis in original).

Here, when Franklin was tased, he was not immobilized. He took several steps back, pulled the taser prongs off, and remained standing for 15 seconds before he laid on the ground. [9], Ex. 1 at 3:22-3:37. When he pulled the taser prongs off, he stood with his arms wide by his sides looking at Officer Capers for two seconds. He immediately bent over and laid down when Officer Combs approached him to handcuff him. When Combs approached Franklin, he told him to "turn around" and "let me see your hands." *Id.* 3:38-3:54. Franklin's hands were tucked firmly under his arms, such that Officer Combs struggled to secure the handcuff around Franklin's right wrist. Combs instructed Franklin twice to stop resisting.

Officer Capers told Franklin several times to put his hands behind his back. When Franklin did not put his hands behind his back, Capers held his taser to Franklin's leg and instructed him again to place his hands behind his back. Capers gave Franklin the instruction six times before he drive-stunned Franklin's thigh. Both officers told Franklin that he would be tased again. Notably, while the officers were instructing Franklin to put his hands behind his back, Smith (who was

28

standing in the driveway near the house) can be heard telling Franklin to put his hands behind his back. *See* [9], Ex. 1 at 4:05-4:11.

Considering the totality of the circumstances, a reasonable officer in Officer Capers' position could have perceived Franklin's actions as resistance. Prior to the initial tase, Franklin was confrontational and ignored commands. The initial tase did not incapacitate him, and when he pulled the taser prongs off, he appeared to take a confrontational stance again, though the stance was brief. Thus, a reasonable officer could believe that he laid on the ground, tucked his hands under his arms, and failed to follow commands because he was actively continuing his resistance to arrest—*not* because he was hurt. This factor weighs in favor of Officer Capers.

As noted above, the relationship between the need for force and the amount of force used is additionally relevant to the reasonableness analysis. *See Solis*, 31 F.4th at 982. "For an officer's force to be reasonable, it must be commensurate with the suspect's level of contemporaneous, active resistance." *Joseph ex rel. Estate of Jospeh v. Bartlett*, 981 F.3d 319, 335 (5th Cir. 2020). Here, though the initial tase did not incapacitate Franklin, he was no longer walking towards Officer Capers in a confrontational manner. Instead, he was resisting arrest by tucking his hands under his arms and disregarding commands while on the ground. Officer Capers' reduced use of force—that is, using the drive-stun maneuver rather than taser—in response to the de-escalation in Franklin's resistance demonstrates a reasonable relationship between the need for force and the amount used.[10]

And lastly, the Court considers the speed at which Officer Capers resorted to the drive-stun maneuver. *See Trammel*, 868 F.3d at 342. Like the initial tase, Officer Capers gave Franklin

---

[10] The drive-stun mode on a taser creates a more localized reaction than the taser. *See Cloud*, 993 F.3d at 382 n. 2 ("When taser prongs are deployed, they conduct an electric current that can immobilize a person by causing his muscles to seize up. A taser in drive-stun mode inflicts a painful electric shock on contact, but does not cause the same seizing effect.").

multiple commands and warned him that he would be tased if he did not comply. Officer Combs struggled to handcuff Franklin for approximately 35 seconds before Officer Capers drive-stunned Franklin. *See* [9], Ex. 1 at 3:40-4:16; *see also Cloud*, 993 F.3d at 386 (where plaintiffs argued that only a few seconds elapsed between the officer's initial tase and drive-stun maneuver, court found "the situation remained tense, uncertain, and rapidly evolving," making continued use of force reasonable). The fact that Officer Capers did not immediately resort to force after tasing Franklin the first time tends to indicate that his of force was reasonable. Accordingly, the Court finds that Officer Capers' did not violate the Fourth Amendment when he drive-stunned Franklin in order to arrest him.

In sum, Franklin has failed to establish a question of fact as to a constitutional violation under the Fourth Amendment. Therefore, even if Franklin's Section 1983 claims were not *Heck* barred, they nevertheless fail on the merits. *See Quinn*, 20203 WL 2731037, at * 3 ("[I]f [plaintiff] cannot establish a question of fact as to a constitutional violation, he cannot prevail on any of his Section 1983 claims against any Defendant.").[11]

---

[11] The Court notes that even if Franklin created a question of fact as to a constitutional violation, his Section 1983 claims nonetheless fail for a number of other important reasons. Specifically, Officer Capers is entitled to qualified immunity because Franklin has "failed to provide controlling precedent showing that [Capers'] particular conduct violated a clearly established right." *Craig*, 49 F.4th at 409. Franklin's individual capacity claim against Chief Sampson fails because he points to no evidence that Sampson was personally involved in the alleged constitutional violation or that Sampson implemented a policy that caused the violation. *See Gates v. Tex. Dept. of Protective and Regulatory Servs.*, 537 F.3d 404, 435 (5th Cir. 2008) ("A supervisory official may be held liable under § 1983 only if (1) he affirmatively participates in the acts that cause the constitutional deprivation, or (2) he implements unconstitutional policies that causally result in the constitutional injury."). Similarly, as to the City of Indianola, Franklin points to no municipal policy that caused the alleged constitutional violation. *See Valle*, 613 F.3d at 541 ("To establish municipal liability under § 1983, a plaintiff must show the deprivation of a federally protected right caused by action taken 'pursuant to an official municipal policy.'"). Lastly, Franklin's official capacity claims against Officer Capers and Chief Sampson are duplicative of his claims against the City and subject to dismissal on that basis. *See, e.g.*, *Garza v. Escobar*, 972 F.3d 721, 734 (5th Cir. 2020) (affirming dismissal of official capacity claims as duplicative claims of claims against county).

II.      *State Law Claims*

As to Chief Sampson and the City of Indianola, Franklin asserts a state law claim for negligent hiring, training, and supervision. As to all Defendants, he asserts claims for negligent and/or intentional infliction of emotional distress; reckless endangerment, assault and battery, abuse of process, reckless disregard, and outrage.[12]

There are several claims the Court addresses at the outset. First, "the tort of outrage is synonymous to intentional infliction of emotional distress[.]" *Burnett v. Hinds Cnty. by and through Bd. of Supervisors*, 313 So. 3d 471, 477 (Miss. 2020) (citing *Raddin v. Manchester Educ. Found., Inc.*, 175 So. 3d 1243, 1252 (Miss. 2015)). The Court will therefore treat those claims as one claim for intentional infliction of emotional distress. Additionally, the Court dismisses Franklin's reckless disregard claim because "Mississippi does not recognize reckless disregard as an independent tort." *Quinn*, 2023 WL 2731037, at *7 (quoting *Hodges v. Allstate Ins. Co.*, 2022 WL 766452, at *4 (S.D. Miss. Mar. 11, 2022)). The same is true for reckless endangerment, which, in Mississippi, is an element of certain crimes. *See generally Young v. State*, 86 So.3d 261, 266-67 (Miss. Ct. App. 2011) (discussing "reckless or willful disregard" element of felony evasion). Thus, to the extent Franklin intended to assert reckless disregard and reckless endangerment as independent causes of action, those purported claims are dismissed.

Turning to Franklin's remaining state law claims, "the MTCA is the exclusive state remedy against a governmental entity and its employees for tortious acts or omissions which give rise to civil liability." *Black v. North Panola Sch. Dist.*, 461 F.3d 584, 594 (5th Cir. 2006) (citing Miss.

---

[12] Candidly, it is unclear whether Franklin's Complaint [1] brings these claims against all Defendants. He appears to allege that Officer Capers committed these torts and that the City is responsible based on respondeat superior. However, he frequently uses the collective term "Defendants." *See* [1] at p. 6-7. Thus, the Court considers the claims as lodged against all Defendants.

CODE ANN. § 11-46-7(1)). The MTCA waives sovereign immunity for torts committed by governmental entities or their employees acting within the course and scope of their employment. MISS. CODE ANN. § 11-46-5(1). However, the MTCA shields governmental employees from individual liability for acts taken within the course and scope of their employment, specifically providing:

> An employee may be joined in an action against a governmental entity in a representative capacity if the act or omission complained of is one for which the governmental entity may be liable, but no employee shall be held personally liable for acts or omissions occurring within the course and scope of the employee's duties.

MISS. CODE ANN. § 11-46-7(2); *see also Burnett*, 313 So. 3d at 478 ("The MTCA does not allow a negligence claim individually against an employee operating within the course and scope of employment.").

On the other hand, the MTCA does not waive the sovereign immunity of the state and its political subdivisions where an employee acts *outside* of the course and scope of his employment. *Hawkins v. City of Lexington*, 2021 WL 5236017, at *6 (S.D. Miss. July 9, 2021) (citing *Cockrell v. Pearl River Valley Water Supply Dist.*, 865 So. 2d 357, 361 (Miss. 2004)) (emphasis added). On that point, the MTCA provides that "an employee shall *not* be considered as acting within the course and scope of his employment and a governmental entity shall *not* be liable or be considered to have waived immunity for any conduct of its employee if the employee's conduct constituted fraud, malice, libel, slander, defamation or any criminal offense other than traffic violations." MISS. CODE ANN. § 11-46-5(2) (emphasis added). Furthermore, "[t]he Mississippi Supreme Court has held that torts which require proof of malice as an essential element are excluded from the MTCA under this section." *Weible v. Univ. of So. Miss.*, 89 So. 3d 51, 64 (Miss. Ct. App. 2011) (citing *Zumwalt v. Jones Cnty. Bd. of Supervisors*, 19 So. 3d 672, 688-69 (Miss. 2009)).

Stated simply, where a claim falls outside of the MTCA because it was committed outside of the employee's course of employment, the government retains its sovereign immunity and the legal action must proceed against the employee individually. *See Hawkins*, 2021 WL 5236017, at *6 (citing *Univ. of Miss. Med. Ctr. v. Oliver*, 235 So. 3d 75, 82 (Miss. 2017)).

Relying on these authorities, to the extent Franklin's claims for assault, battery, intentional infliction of emotional distress, and abuse of process are directed toward the City of Indianola, Chief Sampson (in his official capacity), and Officer Capers (in his official capacity), they must be dismissed because those claims, by their very nature, allege that Officer Capers was not acting within the course and scope of his employment. *See Renfroe v. Parker*, 374 So.3d 1234, 1241-42 (Miss. Ct. App. 2023) (assault, battery, and intentional infliction of emotional distress claims fall outside of scope of MTCA); *Ayles ex rel. Allen v. Allen*, 907 So. 2d 300, 303 (Miss. 2005) (noting that abuse of process "is the malicious perversion of a regularly issued civil or criminal process," requiring a plaintiff to prove that the party, acting with an ulterior motive, made an illegal use of process and caused damages).[13] Therefore, the MTCA's waiver of sovereign immunity is inapplicable and these claims are not cognizable against the City or the officers in their official capacities.[14] Franklin's claims for assault, battery, intentional infliction of emotional distress, and

---

[13] The Court notes that malice is not necessarily an element of intentional infliction of emotional distress or abuse of process. *See Burroughs v. City of Laurel, Miss.*, 2019 WL 4228438, at *3 (S.D. Miss. Sept. 5, 2019) ("[M]alice is not a required element of abuse of process.") (citations omitted); *Weible*, 89 So. 3d at 64 ("Intentional infliction of emotional distress can be predicated on behavior that is malicious. . . Thus, to the extent intentional infliction of emotional distress is predicated on malicious conduct, the claim would be outside the scope of the MTCA."). However, the Complaint's [1] abuse of process section alleges that Officer Capers acted with malice. *See* [1] at p. 7. And the Response Memorandum [23] notes that an intentional infliction of emotional distress claim must proceed against an officer individually. *See* [23] at p. 9. Thus, it appears that Franklin alleges that both claims are predicated on malicious conduct and not subject to the MTCA. Importantly, if the claims were within the scope of the MTCA, they would be barred by police protection immunity discussed herein.

[14] As noted, claims against officers in their official capacities are synonymous with claims against the municipality. *See Garza*, 972 F.3d at 734.

abuse of process against the City of Indianola, Chief Sampson (in his official capacity), and Officer Capers (in his official capacity) are hereby dismissed.

This leaves Franklin's negligent infliction of emotional distress claim against all Defendants; his negligent hiring, training, and supervision claims against the City and Chief Sampson (in his official and individual capacities); and his assault, battery, intentional infliction of emotional distress, and abuse of process claims against Officer Capers (in his individual capacity), to which the MTCA does not apply. The Court will address the remaining claims in turn.

### A. *MTCA Claims*

As an initial matter, Franklin's negligence-based claims fall within the scope the MTCA, and the officers cannot be held individually liable. *See Burnett*, 313 So. 3d at 478. To the extent his negligent infliction of emotional distress and negligent hiring, training, and supervision claims are lodged against Chief Sampson and Officer Capers in their individual capacities, those claims are dismissed. What's more, to the extent those claims are asserted against Sampson and Capers in their official capacities, they are duplicative of claims against the City and dismissed on that basis. *See Garza*, 972 F.3d at 734.

The Court now considers the same claims to the extent they are asserted against the City. The Defendants raise multiple defenses available under the MTCA.

First, the Defendants assert that Franklin's claims are procedurally barred for failure to provide notice as required by the MTCA. In response, Franklin presents a Notice of Claim, which he alleges satisfied the notice requirement. *See* [22], Ex. 2. The Defendants contend that Franklin has provided no evidence that the Notice was actually received. Furthermore, the Defendants

contend that even if the Notice was received, it contains insufficient information to satisfy the notice requirement.

The MTCA's waiver of sovereign immunity is subject to certain conditions, including that a claimant must file a Notice of Claim with the governmental entity at least 90 days before instituting suit. MISS. CODE ANN. § 11-46-11(1). Section 11-46-11 establishes the procedures applicable to the notice requirement and provides that every notice of claim shall contain the following seven categories of information:

> A short and plain statement of the facts upon which the claim is based, including the circumstances which brought about the injury, the extent of the injury, the time and place the injury occurred, the names of persons known to be involved, the amount of money damages sought, and the residence of the person making the claim at the time of the injury and at the time of filing the notice.

MISS. CODE ANN. § 11-46-11(2)(b)(iii).

The Mississippi Supreme Court requires "substantial compliance" with the MTCA notice provisions. *Lee v. Mem'l Hosp. at Gulfport*, 999 So. 2d 1263, 1266 (Miss. 2008) (citing *Reaves ex rel. Rouse v. Randall*, 729 So. 2d 1237, 1240 (Miss. 1999)). "Though substantial compliance with the notice provisions is sufficient, substantial compliance is not the same as, nor a substitute for non-compliance." *Lane v. Miss. Dep't of Trans., So. Dist.*, 220 So. 3d 254, 256 (Miss. Ct. App. 2017) (quoting *Fairley v. George Cnty.*, 871 So. 2d 713, 716 (Miss. 2004)). As such, "[the court] has held that all seven categories of information listed in the statute must be contained in the notice of claim." *Burnett*, 313 So. 3d at 478 (citing *Parker v. Harrison Cnty. Bd. of Supervisors*, 987 So. 2d 435, 440 (Miss. 2008)). "[The court] does not reach the issue of substantial compliance with the statute unless the notice contains *some information* for each category." *Id.* (citing *Parker*, 987 So. 2d at 440) (emphasis added).

Here, the Defendants contend that Franklin's Notice omits the following categories of information: Franklin's residence or address at the time of the incident or at the time making the claim, the extent of his injuries, and a demand for money damages sought. The Defendants are correct—the Notice fails to include the amount of damages sought or Franklin's residence at time of injury or at the time of the notice. *See* [22], Ex. 2. Franklin's MTCA claims are subject to dismissal on that basis alone. *See Price v. Clark*, 21 So. 3d 509, 520 (Miss. 2009) (affirming finding that notice did not substantially comply with MTCA where it did not contain monetary amount of damages sought or claimant's residence at time of injury or claim). Out of an abundance of caution, the Court will address the Defendants' alternative arguments in favor of dismissal.

The Defendants contend that even if Franklin complied with the MTCA's notice requirements, the City is entitled to police protection immunity and discretionary function immunity under the MTCA. With respect to police protection immunity, the statute provides as follows:

> (1) A governmental entity and its employees acting within the course and scope of their employment or duties shall not be liable for any claim:
>
> . . .
>
> > (c) Arising out of any act or omission of an employee of a governmental entity engaged in the performance or execution of duties or activities relating to police or fire protection unless the employee acted in reckless disregard of the safety and well-being of any person not engaged in criminal activity at the time of injury;

Miss. Code Ann. § 1-46-9(1)(c).

The Defendants assert that police protection immunity applies because (1) Franklin cannot prove that Officer Capers acted with reckless disregard and (2) Franklin was engaged in criminal activity at the time of injury. Turning to the latter, "[f]or recovery from a governmental entity to

36

be barred because of the victim's criminal activity, the criminal activity must have some causal nexus to the wrongdoing of the tortfeasor." *McCreary v. City of Gautier*, 89 So.3d 703, 708 (Miss. Ct. App. 2012) (citing *City of Jackson v. Perry*, 764 So.2d 373, 379 (Miss. 2000)). "Where an officer has probable cause to arrest and proceeds to do so, there is the requisite nexus between criminal activity and the action causing injury.*" Miss. Dep't of Public Safety v. Durn*, 861 So.2d 990, 997 (Miss. 2003) (quoting *Bridge v. Pearl River Valley Water Supply Dist.*, 793 So. 2d 584, 588 (Miss. 2001)). At the time Officer Capers allegedly injured Franklin, Franklin was engaged in criminal activity and Capers had probable cause to arrest him, evidenced by his undisputed convictions for carrying a concealed weapon and disorderly conduct discussed above. As such, the City is entitled to police protection immunity for claims related to Capers' police protection activities. *See S.R. by and through Musgrove v. Scott Cnty., Miss.*, 2022 WL 683644, at *6 (S.D. Miss. Feb. 4, 2022) (finding police protection immunity applied where police lawfully detained plaintiff for disorderly conduct).

Lastly, with respect to discretionary function immunity, the MTCA provides that a governmental entity shall not be liable "[b]ased upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a governmental entity or employee thereof, whether or not the discretion be abused." MISS. CODE ANN. § 1-46-9(1)(d). To determine whether discretionary immunity applies, the Court must first determine "whether the activity in question involved an element of choice or judgment," and if so, "whether that choice or judgment involved social, economic, or political-policy considerations." *City of Clinton v. Tornes*, 252 So. 3d 34, 39 (Miss. 2018) (citing *Wilcher v. Lincoln Cty. Bd. of Supervisors*, 243 So. 3d 177 (Miss. 2018)). Relevant to Franklin's negligent hiring, training, and supervising claim, the Mississippi Supreme Court has held that "[t]he manner in which a police department supervises,

disciplines and regulates its police officers is a discretionary function of the government." *Id.* Franklin's negligent hiring, training, and supervising claim necessarily seeks to hold the City liable for discretionary functions and is therefore barred by discretionary function immunity. *See id.* (finding City entitled to discretionary immunity where plaintiff claimed it failed to train officer on operation of police vehicle).

For these reasons, Franklin's negligent infliction of emotional distress and negligent hiring, training, and supervising claims are dismissed.

### B. Non-MTCA Claims

Lastly, the Court turns to Franklin's abuse of process, assault, battery, and intentional infliction of emotional distress claims against Officer Capers in his individual capacity.[15] As noted, these claims fall outside of the scope of the MTCA because they necessarily allege that Officer Capers' actions were committed with malice or criminal intent, i.e., outside of the scope of his employment.

First, the elements of an abuse of process claim are: "(1) the party made an illegal use of a legal process, (2) the party had an ulterior motive, and (3) damage resulted from the perverted use of process." *Ayles ex rel. Allen*, 907 So. 2d at 303. "It is 'the employment of process for its ostensible purpose, but without reasonable or probable cause.'" *Owens v. Mason*, 2018 WL 6580509, at *5 (S.D. Miss. Dec. 13, 2018) (quoting *Miss. ex rel. Foster v. Turner*, 319 So. 2d 233, 236 (Miss. 1975)). Franklin argues that he was handcuffed without probable cause and that "Defendants intentionally misused the legal process by tasing Plaintiff while he was detained in handcuffs." [23] at p. 6, 9. Franklin's undisputed convictions and the body camera footage clearly

---

[15] Again, it is unclear whether Franklin intended to bring these non-MTCA claims against Chief Sampson in his individual capacity. He points to no evidence that Chief Sampson was involved in the subject incident. To the extent Franklin's claims are lodged against Chief Sampson in his individual capacity, they are dismissed.

contradict his arguments, and he submits no other summary judgment evidence to support his claim. Franklin's abuse of process claim against Officer Capers in his individual capacity is therefore dismissed. *See Goode v. Walmart, Inc.*, 372 So. 3d 149, 165 (Miss. Ct. App. 2023) (affirming dismissal of abuse of process claim where defendant had probable cause to instigate criminal proceedings).

Next, to succeed on an intentional infliction of emotional distress claim, the defendant's acts must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Speed v. Scott*, 787 So. 2d 626, 630 (Miss. 2001) (citation omitted). As discussed above, Officer Capers' conduct was objectively reasonable pursuant the *Graham* factors and therefore could not be considered to "evoke outrage and revulsion in a civilized society." *Renfroe*, 374 So. 3d at 1243-44 (affirming dismissal of intentional infliction of emotional distress claim where officer's use of force was found objectively reasonable and not excessive and "therefore…could not be considered to evoke outrage and revulsion in a civilized society"); *see also Hawkins*, 2021 WL 5236017, at *8 (finding "no reasonable jury could find for [the plaintiff] on the IIED claim against [the officer] for the same reasons the excessive-force claim against him fails"). Franklin's intentional infliction of emotional distress claim against Officer Capers in his individual capacity is dismissed.

Finally, the Mississippi Supreme Court has defined the intentional torts of assault and battery as follows:

> Assault occurs where a person (a) acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and (b) the other is thereby put in such imminent apprehension. A battery goes one step beyond an assault in that a harmful contact actually occurs.

39

*Webb v. Jackson*, 583 So. 2d 946, 951 (Miss. 1991) (citation and quotation marks omitted).

"When making an arrest, a police officer 'may exert such physical force as is necessary to effect the arrest by overcoming the resistance he encounters, but he can not take the life of the accused or inflict upon him great bodily harm except to save his own life or to prevent a like harm to himself.'" *Renfroe*, 374 So.3d at 1244 (quoting *Webb*, 583 So. 2d at 951).

As discussed in the excessive force analysis, Officer Capers could have reasonably perceived Franklin as a threat to his safety and as resisting arrest, and he used an amount of force commensurate with Franklin's level of resistance. Franklin has submitted no evidence that Capers intentionally, unlawfully used force against him. Accordingly, Franklin's assault and battery claims against Officer Capers in his individual capacity are dismissed. *See id.* (affirming dismissal of plaintiff's assault and battery claims where officer reasonably perceived decedent as a threat and non-lethal force failed to stop decedent's threat).

*Conclusion*

For the reasons set forth above, the Defendants' Motions for Judgment on the Pleadings or, alternatively, Motions for Summary Judgment [14, 16] are hereby GRANTED. Franklin's Complaint [1] is dismissed *with prejudice*. A Final Judgment will issue this day. This CASE is CLOSED.

SO ORDERED, this the 25th day of September, 2024.

/s/ Sharion Aycock
UNITED STATES DISTRICT JUDGE